**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ELIZA PARKER**, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

**QUANTUM HEALTH, INC.**,

Defendant.

Case No. 2:26-cv-02

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Eliza Parker ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this class action against Defendant Quantum Health, Inc. ("Quantum Health" or "Defendant") arising from the unauthorized access to and acquisition of Plaintiff's and Class Members' sensitive personally identifiable information and protected health information in the data breach described below. Plaintiff alleges the following based on personal knowledge as to herself and her own experiences, and upon information and belief—including the investigation of counsel and facts of public record—as to all other matters.

## INTRODUCTION

1. This class action arises from Quantum Health's failure to protect the highly sensitive personal and medical information entrusted to it, and from a data breach that was foreseeable, preventable, and the direct result of Quantum Health's inadequate data-security practices.

2. Quantum Health is a healthcare navigation and care-coordination company that provides services for the enrolled and eligible employees of employers that sponsor self-insured health plans (the "Plans"). In performing those services, Quantum Health collects, receives, stores,

and maintains vast quantities of sensitive personally identifiable information ("PII") and protected health information ("PHI") (together, "Private Information") concerning the current and former members and beneficiaries of the Plans, including Plaintiffs and the Class.

3. Because Quantum Health sits at the center of the flow of information among employees, employers, insurers, and healthcare providers, it aggregates and maintains an especially large and sensitive volume of Private Information. Quantum Health knew that this information was a target for cybercriminals and that its unauthorized disclosure would cause serious harm to the individuals to whom it related.

4. Between on or about May 29, 2026, and June 1, 2026, an unauthorized third party gained access to Quantum Health's information-technology network and accessed and acquired files containing the Private Information of Plaintiff and Class Members (the "Data Breach").

5. The Data Breach was not the product of an unforeseeable or unavoidable intrusion. According to Quantum Health's own notice of the incident, the unauthorized access "resulted from a user responding to a vishing call" on May 29, 2026. "Vishing" (voice phishing) is a social-engineering technique in which an attacker telephones an employee and deceives the employee into divulging credentials or granting access. Vishing and other social-engineering attacks are among the most well-known, widely publicized, and readily preventable methods by which criminals compromise corporate networks, and defending against them is a basic, long-established component of reasonable data security.

6. That a single employee's response to a fraudulent telephone call allowed an outside actor to reach and remove files containing the Private Information of large numbers of individuals demonstrates that Quantum Health failed to implement reasonable and industry-standard safeguards—including workforce security-awareness training, phishing-resistant multi-factor

authentication, help-desk identity-verification procedures, least-privilege access controls, network segmentation, and monitoring sufficient to detect and stop the mass exfiltration of sensitive data.

7. Quantum Health has acknowledged that the files involved in the Data Breach contained individuals' names together with one or more of the following: personal information (such as date of birth, Social Security number, email, address, telephone number, or demographic information); health-insurance information (such as insurance policy number or claims/benefits information); and health information (such as medical information, treatment information, diagnoses, prescriptions, provider names, and dates of service).

8. This information is among the most sensitive that exists. Unlike a payment-card or account number, a Social Security number and a person's medical history, diagnoses, prescriptions, and health-insurance identifiers cannot be cancelled, revoked, or replaced. Once exposed, they remain associated with the individual for life and can be exploited for medical identity theft, health-insurance fraud, and financial fraud far into the future.

9. Quantum Health has stated that it detected a "service outage" affecting the availability of certain internal and external systems on June 1, 2026; that it determined on July 8, 2026, that the affected files contained personal information; that it began notifying the Plans on or about July 24, 2026; and that it mailed individual notice letters, through its vendor Kroll, dated August 14, 2026. During the period between the intrusion and notice, Plaintiff and Class Members were unaware that their Private Information had been compromised and were unable to take steps to protect themselves against the specific risks created by the Data Breach.

10. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injury, including the loss of privacy and control over their Private Information; a present, imminent, and continuing increased risk of medical identity theft,

health-insurance fraud, and financial identity theft; the time and expense of mitigation; the diminished value of their Private Information; anxiety and emotional distress; and, for certain Plaintiffs, actual misuse of their Private Information. The twenty-four months of credit and identity monitoring Quantum Health offered through Kroll is inadequate to protect against risks that—because they arise from immutable identifiers and permanent medical information—will persist for the remainder of Plaintiff's and Class Members' lives.

11. Plaintiff brings this action individually and on behalf of a nationwide class of all persons whose Private Information was compromised in the Data Breach, and seek damages, equitable relief, and all other relief the Court deems just.

## THE PARTIES

12. Plaintiff Eliza Parker is a natural person and a citizen of the State of Michigan, residing in New Buffalo, Berrien County, Michigan. As a member or beneficiary of an employer-sponsored health plan for which Quantum Health provided healthcare-navigation and care-coordination services, Dr. Parker's Private Information was collected and maintained by Quantum Health. Dr. Parker received an individualized notice of the Data Breach from Quantum Health dated August 14, 2026.

13. Defendant Quantum Health, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5240 Blazer Parkway, Dublin, Ohio 43017. Quantum Health provides healthcare-navigation, care-coordination, and benefits-administration services to employers and their employees throughout the United States, and in doing so collects, receives, maintains, and uses the Private Information of members and beneficiaries of the Plans, including Plaintiffs and the Class.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 members; and at least one member of the proposed Class is a citizen of a State different from Defendant. Quantum Health is a citizen of Delaware and of Ohio, while Plaintiff and numerous Class Members are citizens of Michigan, Illinois, and other States. The minimal diversity required by 28 U.S.C. § 1332(d)(2)(A) is therefore satisfied.

15. The amount in controversy includes the value of the monetary, statutory, declaratory, and injunctive relief sought on behalf of Plaintiff and the proposed Class. No exception to CAFA jurisdiction applies.

16. This Court has general personal jurisdiction over Quantum Health because Quantum Health maintains its principal place of business in Dublin, Ohio, and is therefore "at home" in this State. The Court also has specific personal jurisdiction because a substantial part of the acts and omissions giving rise to Plaintiff's claims—including Quantum Health's collection, maintenance, and inadequate protection of Private Information—occurred at and were directed from Quantum Health's Ohio headquarters.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because Quantum Health resides in this District, and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including the decisions concerning, and the implementation and maintenance of, the data-security practices at issue. Venue is proper in the Eastern Division under S.D. Ohio Civ. R. 82.1 because Quantum Health's principal place of business is located in Franklin County.

## FACTUAL ALLEGATIONS

### A. Quantum Health Collects and Maintains Highly Sensitive Private Information

18. Quantum Health is a healthcare-benefits and care-navigation company that helps employers administer their self-insured health plans and helps employees navigate the healthcare system. Its services include benefits administration, claims support, healthcare advocacy, and care coordination, and it acts as a central point of contact among employees, employers, insurers, and healthcare providers.

19. Upon information and belief, and based on Quantum Health's own public statements, Quantum Health services hundreds of employer clients—reportedly more than 570—and more than 20 million members. To perform its services, Quantum Health collects, receives, stores, transmits, and uses the Private Information of those members, including their names, dates of birth, Social Security numbers, contact and demographic information, health-insurance policy numbers and claims/benefits information, and health information such as medical information, treatment information, diagnoses, prescriptions, provider names, and dates of service.[1]

20. Plaintiff and Class Members provided, or had provided on their behalf, their Private Information in connection with their membership in the Plans, and reasonably expected that Quantum Health would keep that information confidential and secure. Quantum Health's business depends on the trust of the members whose information it holds and on its ability to safeguard that information.

---

[1] *See* Quantum Health, *About Us*, https://quantum-health.com/about-us (last visited Sep. 1, 2026) (Quantum Health serves more than 20 million members across more than 570 employer clients).

21. By collecting, maintaining, and using this Private Information for its own business purposes, Quantum Health knew or should have known that the information was a target for cyberattacks and that its unauthorized disclosure would cause serious and foreseeable harm to the individuals to whom it related.

**B. Quantum Health's Data-Security Duties**

22. Upon information and belief, Quantum Health is a "business associate" within the meaning of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d, *et seq.*, because it creates, receives, maintains, and transmits PHI on behalf of the Plans, which are HIPAA covered entities. As a business associate, Quantum Health is independently subject to the requirements of the HIPAA Security Rule under 45 C.F.R. § 164.306 and the HITECH Act.[2]

23. The HIPAA Security Rule requires covered entities and business associates, among other things, to ensure the confidentiality, integrity, and availability of electronic PHI; to protect against reasonably anticipated threats or hazards to its security or integrity; to protect against reasonably anticipated impermissible uses or disclosures; and to implement reasonable administrative, physical, and technical safeguards. 45 C.F.R. § 164.306(a)(1)–(3); id. §§ 164.308, 164.310, 164.312. Although HIPAA does not itself provide a private right of action, Plaintiffs relyon its Privacy and Security Rules as evidence of the duties and standard of care applicable to entities that handle sensitive PHI.[3]

---

[2] See Health Information Technology for Economic and Clinical Health Act (HITECH Act), 42 U.S.C. §§ 17931, 17934 (extending HIPAA Security Rule requirements to business associates); 45 C.F.R. § 164.104(b).

[3] *See* 45 C.F.R. §§ 164.306, 164.312 (requiring administrative and technical safeguards for electronic protected health information); HITECH Act, 42 U.S.C. § 17931.

24. Quantum Health's data-security obligations are further informed by widely recognized federal and industry standards. The Federal Trade Commission ("FTC") has long advised that reasonable data security includes building security into operations from the outset; employing access controls and strong, phishing-resistant authentication; conducting network monitoring and segmentation; providing secure remote access; applying timely patches; training the workforce to recognize social-engineering and phishing attempts; and maintaining a written incident-response plan. The FTC has brought enforcement actions under Section 5 of the FTC Act, 15 U.S.C. § 45, treating the failure to employ reasonable data-security measures as an unfair act or practice.[4]

25. Additional authoritative guidance defines the applicable standard of care, including the National Institute of Standards and Technology ("NIST") security and privacy controls and Cybersecurity Framework; the Center for Internet Security's ("CIS") Critical Security Controls; the U.S. Department of Health and Human Services' ("HHS") 405(d) Program and Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals; and the Cybersecurity and Infrastructure Security Agency's ("CISA") #StopRansomware guidance. These sources uniformly identify measures—including phishing-resistant multi-factor authentication, workforce security-awareness training, least-privilege access, network segmentation, logging and monitoring, and data-loss prevention—designed to prevent, detect, and contain precisely the type of social-engineering intrusion that caused the Data Breach.[5]

---

[4] *See* FTC, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sep. 1, 2026); FTC, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sep. 1, 2026).

[5] *See* Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations* (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5 (last visited Sep. 1, 2026);

26. Consistent with these standards, Quantum Health's duties included, among other things: implementing and enforcing workforce training to recognize and resist vishing, phishing, and other social-engineering attacks; requiring phishing-resistant multi-factor authentication and rigorous identity-verification procedures before granting or resetting access; limiting each user's access to only the data necessary for that user's function; segmenting its network so that the compromise of a single account could not expose the Private Information of millions of members; encrypting Private Information at rest and in transit; deploying logging, monitoring, and data-loss-prevention tools sufficient to detect and block unusual access and large data transfers; promptly patching known vulnerabilities; and maintaining and testing an effective incident-response plan.

27. These obligations were established well before the Data Breach by HIPAA, the HITECH Act, federal guidance, and accepted cybersecurity practice. They were not created by the breach or by hindsight, and Plaintiffs and Class Members are among the persons those standards are intended to protect.

**C. The Data Breach**

28. According to Quantum Health, on May 29, 2026 a user responded to a vishing call, and as a result an unauthorized party gained access to Quantum Health's IT network.

---

*Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile* (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final (last visited Sep. 1, 2026); Ctr. for Internet Sec., *CIS Critical Security Controls v8.1* (2024), https://www.cisecurity.org/controls/v8-1 (last visited Sep. 1, 2026); HHS, *Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients* (2023), https://405d.hhs.gov/Documents/HICP-Main-508.pdf (last visited Sep. 1, 2026); HHS, *Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals* (2024), https://hhscyber.hhs.gov/Documents/cybersecurity-performance-goals.pdf (last visited Sep. 1, 2026); Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (Oct. 2023), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf (last visited Sep. 1, 2026).

Between May 29, 2026 and June 1, 2026, the unauthorized party accessed and acquired files from certain Quantum Health systems.[6]

29. Quantum Health has stated that on June 1, 2026, it detected a service outage affecting the availability of certain internal and external systems; that it then secured and isolated its systems, launched an investigation with the support of third-party forensic experts, and reported the incident to federal law enforcement.

30. Quantum Health has further stated that its investigation determined on July 8, 2026, that some of the acquired files contained personal information; that it began notifying the Plans on or about July 24, 2026; and that it thereafter caused individualized notice letters, dated August 14, 2026, to be mailed to affected individuals through its vendor, Kroll.

31. The notices informed recipients that the files involved in the Data Breach contained their names together with one or more of the following categories of Private Information: personal information (such as date of birth, Social Security number, email, address, telephone number, or demographic information); health-insurance information (such as insurance policy number or claims/benefits information); and health information (such as medical information, treatment information, diagnoses, prescriptions, provider names, and dates of service).

32. Quantum Health offered affected individuals twenty-four months of complimentary identity-monitoring services through Kroll. That offer is an implicit acknowledgment that the Data Breach exposed Plaintiff and Class Members to a real and continuing risk of identity theft and fraud. It is also inadequate: the Social Security numbers and permanent medical information exposed cannot be changed, and the resulting risk of

[6] *See* Quantum Health, *Status: Data Security Incident Notice* (July 31, 2026), https://quantum-health.com/status (last visited Sep. 1, 2026).

misuse will persist long after twenty-four months of monitoring expires.

### D. The Data Breach Was Foreseeable and Preventable

33. The Data Breach was eminently foreseeable. The healthcare sector has long been among the most-targeted sectors for cyberattacks, and social-engineering techniques such as vishing and phishing have for years been recognized as leading vectors by which attackers obtain access to corporate networks. Quantum Health knew, or in the exercise of reasonable care should have known, that the enormous volume of Private Information it maintained made it an attractive target and that its workforce would be subjected to social-engineering attempts.[77]

34. Federal regulators and cybersecurity authorities repeatedly warned the healthcare sector about these foreseeable risks, including through the HHS 405(d) Program, the HHS Cybersecurity Performance Goals, and CISA's #StopRansomware guidance, all of which identify phishing-resistant multi-factor authentication, workforce training, and related controls as essential safeguards against social-engineering intrusions.

35. Had Quantum Health implemented reasonable, industry-standard safeguards—including effective workforce security-awareness training, phishing-resistant multi-factor authentication and identity-verification procedures, least-privilege access controls, network segmentation, encryption, robust logging and monitoring, and data-loss-prevention tools—the unauthorized access resulting from the May 29, 2026, vishing call could have been prevented, detected, limited, or contained before Plaintiffs' and Class Members' Private Information was accessed and removed.

---

[7] *See* Identity Theft Res. Ctr., *2025 Annual Data Breach Report* (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited Sep. 1, 2026) (healthcare has for years ranked among the most-targeted sectors for data compromises).

36. That a single user's response to a fraudulent telephone call permitted an outside actor to reach and exfiltrate files containing sensitive Private Information over the course of several days, apparently without detection until a resulting service outage occurred, supports the reasonable inference that Quantum Health's access controls, network segmentation, and monitoring were inadequate to protect the information entrusted to it.

**E. The Sensitivity and Permanence of the Compromised Information**

37. The Private Information compromised in the Data Breach is particularly sensitive because it combines direct identifiers, such as names and Social Security numbers, with intimate health information, such as diagnoses, treatment information, prescriptions, provider names, and health-insurance identifiers. That combination reveals the most private details of a person's health and can be exploited in ways that ordinary financial data cannot.

38. A Social Security number is a gateway to an individual's financial identity and cannot be changed except in extraordinary circumstances. Medical information, diagnoses, prescriptions, medical-record and health-insurance identifiers likewise cannot be cancelled, revoked, or replaced. Once exposed, they remain associated with the individual permanently and can be used to commit medical identity theft, submit fraudulent insurance claims, obtain medical services or prescriptions in another person's name, and corrupt the victim's medical records in ways that may endanger future care.[8]

39. The Government Accountability Office ("GAO") has reported that stolen PII and PHI can be used to open accounts, obtain government benefits and credit, and make purchases in a victim's name, and that victims face substantial cost and inconvenience in

[8] *See* Soc. Sec. Admin., *Identity Theft and Your Social Security Number* (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf (explaining that the Social Security Administration will assign a new Social Security number only in limited and extraordinary circumstances) (last visited Sep. 1, 2026).

repairing the resulting harm. The U.S. Department of Justice's Bureau of Justice Statistics has found that identity-theft victims who resolve associated problems spend, on average, significant time doing so, and that reimbursement does not make a victim whole because of the time and effort misuse requires.[9]

40. The unauthorized disclosure of Private Information also diminishes its value to the individuals to whom it relates by depriving them of the confidentiality, exclusivity, and control they did not authorize criminals to take. Consumers place significant value on data security, and studies confirm that a substantial share of consumers consider data security an important consideration in choosing whom to do business with and would provide less information to, or cease doing business with, an organization that suffered a breach.[10]

**F. Harm to Plaintiffs and Class Members**

41. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer economic and non-economic injury, including: the unauthorized access to, acquisition of, and disclosure of their Private Information, with the corresponding loss of privacy, confidentiality, and control over that information; a present, imminent, and continuing increased risk of medical identity theft,

[9] *See* GAO, *Report to Congressional Requesters: Personal Information* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Sep. 1, 2026); *see also* Erika Harrell, U.S. Dep't of Justice, Bureau of Justice Statistics, *Victims of Identity Theft, 2014* (Sept. 2015), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last visited Sep. 1, 2026).

[10] *See* Cisco, *2024 Consumer Privacy Survey* (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Sep. 1, 2026); Cisco, *2024 Data Privacy Benchmark Study* (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-privacy-benchmark-study-2024.pdf (last visited Sep. 1, 2026) (finding that a substantial share of consumers will not purchase from organizations they do not trust with their data, and that many have switched providers over data-privacy practices); *see also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing that personal identifying information has economic value).

health-insurance fraud, financial identity theft, and targeted phishing and social engineering; actual misuse of their Private Information, as alleged below with respect to certain Plaintiffs; the reasonable time, effort, and out-of-pocket costs already incurred, and reasonably necessary in the future, to monitor for, detect, and mitigate the misuse of their Private Information, including credit freezes and monitoring; the diminished value of their Private Information, which has lost confidentiality, exclusivity, and control; anxiety, concern, and emotional distress arising from the loss of control over their intimate personal and medical information and the ongoing risk of misuse; the deprivation of the benefit of their bargain; and the continuing risk to their Private Information, which remains in Quantum Health's possession and control and remains subject to further unauthorized access absent adequate remediation.

**G. Plaintiff's Experiences**

42. Plaintiff Eliza Parker is a member or beneficiary of an employer-sponsored health plan serviced by Quantum Health, and entrusted her Private Information to Quantum Health with the reasonable expectation that it would be kept confidential and secure.

43. Dr. Parker received an individualized notice of the Data Breach from Quantum Health dated August 14, 2026, informing her that her Private Information was among the files involved in the Data Breach, including her Social Security number. Dr. Parker retained the notice and has provided a copy to counsel.[11]

44. By soliciting and/or accepting Plaintiff Martinez's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

45. Upon information and belief, Transglobal was in possession of Plaintiff

[11] *See* Letter from Quantum Health, Inc., to Eliza Parker (Aug. 14, 2026) (individualized notice of data security incident) (on file with counsel).

Parker's Private Information before, during, and after the Data Breach.

46. Upon information and belief, Plaintiff Parker is a victim of the Data Breach whose Private Information was compromised and stolen therein.

47. Following the Data Breach, upon information and belief, Plaintiff Parker made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Parker estimates he has already spent hours responding to the Data Breach.

48. Plaintiff Parker will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

49. Because of the Data Breach, there is no doubt Plaintiffs Parker's highly confidential Private Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Parker and the Class are at an imminent risk of identity theft and fraud.

50. Plaintiff Parker suffered actual injury from the exposure and theft of her Private Information—which violates his rights to privacy.

51. Plaintiff Parker suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, PII is a form of intangible property, which Defendants were required to adequately protect and safeguard against unauthorized disclosure.

52. Due to Defendants' Breach, Plaintiff Parker will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already

been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendants' breach of duty to maintain Plaintiff Parker's highly sensitive Private Information, including her Social Security number, secure and protected against unauthorized disclosure.

53. Plaintiff Parker places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Parker entrusted Defendant with her Private Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that the Private Information would not be compromised.

54. Plaintiffs Parker's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

55. Knowing that thieves intentionally targeted and accessed her Private Information, has caused Plaintiff Parker great anxiety beyond mere worry.

56. The Data Breach has caused Plaintiff Parker to suffer fear, anxiety, and stress, which has been compounded by Defendants' delay in notifying him of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

57. Plaintiff Parker has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

58. As a direct and traceable result of the Data Breach, Plaintiff Parker suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain

because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her Social Security number and other sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web because that is the modus operandi of cybercriminals; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Martinez; and (g) other economic and non-economic harm.

59. Plaintiff Parker has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

60. Plaintiff Parker has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Parker's Private Information will be wholly unprotected and at-risk of future data breaches.

## CLASS ACTION ALLEGATIONS

61. Pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of the following proposed class (the "Class"):

> All persons residing in the United States whose Private Information was accessed, acquired, or disclosed without authorization in the Data Breach, including all persons who were sent notice of the Data Breach.

62. Excluded from the Class are: Quantum Health and its officers, directors, and employees; any entity in which Quantum Health has a controlling interest, and its parents,

subsidiaries, and affiliates; counsel for the parties; the judicial officers assigned to this action and their staff and immediate families; and any Class Member who timely and validly elects to be excluded.

63. Plaintiff reserves the right to amend or modify the Class definition, including through the addition of statewide subclasses, in connection with their motion for class certification or as warranted by discovery.

64. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. While the exact number is known only to Quantum Health, the Data Breach involved files maintained by a company that services more than 20 million members, and the Class is reasonably believed to number in at least the thousands. Class Members can be identified through Quantum Health's records, including the records used to mail notice of the Data Breach.

65. **Commonality and Predominance.** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual members, including, among others: whether Quantum Health owed a duty to Plaintiff and Class Members to implement and maintain reasonable safeguards to protect their Private Information; whether Quantum Health's data-security practices were reasonable and adequate; whether Quantum Health failed to take reasonable measures to prevent, detect, and contain the social-engineering intrusion that caused the Data Breach; whether Quantum Health's conduct violated the standards of care reflected in HIPAA, the HITECH Act, Section 5 of the FTC Act, and recognized cybersecurity guidance; whether Quantum Health's conduct breached implied contracts with, or obligations owed to, Plaintiff and Class Members; whether the Data Breach caused Plaintiff and Class Members to suffer injury, including loss of privacy and control and

an increased risk of identity theft and fraud; whether Quantum Health's notice of the Data Breach was timely and adequate; and whether Plaintiff and Class Members are entitled to damages, restitution, and declaratory and injunctive relief, and the nature and amount of such relief.

66. **Typicality.** Plaintiff's claims are typical of the claims of the Class. Plaintiffs, like every Class Member, entrusted their Private Information to Quantum Health, had that information compromised in the same Data Breach, and were injured by the same conduct and omissions of Quantum Health. Plaintiff's claims arise from the same events, course of conduct, and legal theories as those of the Class.

67. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to or in conflict with the interests of the Class, and she has retained counsel experienced in complex data-breach and class-action litigation who will vigorously prosecute this action on behalf of the Class.

68. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are relatively small compared with the burden and expense of individual litigation, making it impracticable for Class Members to seek redress individually. Class treatment will conserve judicial resources, avoid inconsistent adjudications, and provide comprehensive relief to Class Members under the supervision of a single court.

69. **Injunctive and Declaratory Relief.** Quantum Health has acted and refused to act on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate for the Class as a whole. Class-wide injunctive relief is warranted to remedy Quantum Health's inadequate data-security practices and to protect Plaintiff's and

Class Members' Private Information, which remains in Quantum Health's possession and control.

70. **Issue Certification.** In the alternative, Plaintiff seeks certification under Rule 23(c)(4) of the particular issues identified above, including the existence and breach of Quantum Health's duties and the adequacy of its data-security practices, which are susceptible to common, class-wide resolution.

## CAUSES OF ACTION

### COUNT I
NEGLIGENCE AND NEGLIGENCE PER SE
(On Behalf of the Nationwide Class)

71. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72. Quantum Health owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, receiving, maintaining, using, and safeguarding their Private Information against foreseeable threats, including social-engineering attacks and other unauthorized access and disclosure. This duty arose from Quantum Health's undertaking to provide services requiring the collection and maintenance of Private Information, from its status as a HIPAA business associate, and from the foreseeable and highly sensitive nature of the information it held.

73. Quantum Health also owed a duty to maintain reasonable incident-response, detection, and notice procedures, including the duty to detect unauthorized access promptly, to determine the information affected, and to provide accurate and timely notice so that affected individuals could take protective measures.

74. Quantum Health breached these duties by, among other things, failing to

implement and maintain reasonable and industry-standard safeguards appropriate to the volume and sensitivity of the Private Information it held; failing to train and equip its workforce to recognize and resist vishing and other social-engineering attacks; failing to require phishing-resistant multi-factor authentication and adequate identity-verification procedures; failing to limit access through least-privilege controls and to segment its network; failing to deploy monitoring and data-loss-prevention tools sufficient to detect and stop the exfiltration of large volumes of data; and failing to detect and contain the intrusion in a timely manner.

75. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits unfair acts or practices, including the failure to employ reasonable measures to protect sensitive personal information. Quantum Health's violation of Section 5 of the FTC Act, together with its failure to comply with the standards of care reflected in HIPAA and the HITECH Act, constitutes negligence *per se*. Plaintiff and Class Members are within the class of persons those laws and standards are intended to protect, and the harm they suffered is the type those laws and standards are intended to prevent.[12]

76. It was reasonably foreseeable that Quantum Health's failures would result in the unauthorized access to and acquisition of Plaintiff's and Class Members' Private Information and the resulting harm. Neither Plaintiffs nor any Class Member contributed to the Data Breach.

77. As a direct and proximate result of Quantum Health's negligence and negligence per se, Plaintiff and Class Members have suffered and will continue to suffer the

---

[12] *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240–47 (3d Cir. 2015) (affirming the FTC's authority under Section 5 of the FTC Act to challenge unreasonable data-security practices as unfair).

injuries and damages described above, including actual misuse, loss of privacy and control, an increased risk of identity theft and fraud, mitigation time and expense, diminished value of their Private Information, emotional distress, and loss of the benefit of their bargain. Plaintiff and the Class are entitled to recover all available compensatory, consequential, nominal, and other damages, as well as equitable relief.

**COUNT II**
BREACH OF IMPLIED CONTRACT
(On Behalf of the Nationwide Class)

78. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79. Plaintiff and Class Members provided, or had provided on their behalf, their Private Information to Quantum Health in connection with the services Quantum Health rendered for the Plans in which they were members or beneficiaries.

80. By accepting and undertaking to maintain that Private Information in order to provide its services, Quantum Health entered into implied contracts with Plaintiff and Class Members under which Quantum Health agreed to safeguard the Private Information, to keep it confidential, to use it only for authorized purposes, and to protect it from unauthorized access and disclosure using reasonable safeguards consistent with applicable law and industry standards.

81. Plaintiff and Class Members reasonably expected, and it was a mutually understood term of these implied contracts, that Quantum Health would implement adequate data security. A portion of the consideration paid for Quantum Health's services was understood to be devoted to reasonable data security.

82. Quantum Health breached these implied contracts by failing to implement and maintain reasonable safeguards for Plaintiff's and Class Members' Private Information and by

permitting it to be accessed and acquired without authorization in the Data Breach.

83. As a direct and proximate result of Quantum Health's breach, Plaintiff and Class Members suffered the injuries and damages described above, including the loss of the benefit of their bargain, and are entitled to compensatory, consequential, nominal, and other damages, and to appropriate equitable relief.

**COUNT III**
UNJUST ENRICHMENT
(On Behalf of the Nationwide Class)

84. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein, and plead this claim in the alternative to their contract-based claims.

85. Plaintiff and Class Members conferred a benefit on Quantum Health by entrusting their Private Information to it, and through the payments made for the services Quantum Health provided, a portion of which was intended to fund adequate data security. Quantum Health derived value from the Private Information and from the ability to provide its services while maintaining that information.

86. Quantum Health knew of and appreciated these benefits and accepted and retained them under circumstances that make its retention of the full value inequitable, because Quantum Health failed to provide the reasonable data security for which Plaintiff and Class Members bargained and reasonably expected.

87. It would be unjust and inequitable for Quantum Health to retain the full benefit of the value conferred upon it without providing adequate data security. Plaintiff and Class Members are entitled to restitution, disgorgement, and other equitable monetary relief necessary to prevent Quantum Health from retaining benefits obtained without providing the security it was obligated to provide.

**COUNT IV**
BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
(On Behalf of the Nationwide Class)

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. Upon information and belief, Quantum Health entered into contracts with the Plans (and/or their sponsors, administrators, or insurers) to provide healthcare-navigation, care-coordination, and benefits-administration services. Consistent with HIPAA's requirements for business associates, those contracts obligated Quantum Health to implement reasonable safeguards to protect the Private Information of the Plans' members and beneficiaries and to maintain the confidentiality, integrity, and availability of that information. The specific terms of those contracts are presently within the knowledge and control of Quantum Health and the Plans.

90. Plaintiff and Class Members, as the members and beneficiaries whose Private Information Quantum Health agreed to protect, are the intended third-party beneficiaries of Quantum Health's data-security obligations under those contracts. The very purpose of those obligations was to protect the individuals whose Private Information Quantum Health maintained.

91. Quantum Health breached those contractual obligations by failing to implement and maintain reasonable safeguards and by allowing Plaintiff's and Class Members' Private Information to be accessed and acquired without authorization in the Data Breach.

92. As intended third-party beneficiaries, Plaintiff and Class Members suffered damages as a direct and proximate result of Quantum Health's breach, including loss of privacy and control, increased risk of misuse, mitigation burdens, emotional distress, and the

diminished value of their Private Information, and are entitled to all available contractual and equitable relief.

**COUNT V**
DECLARATORY AND INJUNCTIVE RELIEF
(On Behalf of the Nationwide Class)

93. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, an actual and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and Quantum Health, on the other, concerning Quantum Health's duties to safeguard Private Information and the adequacy of its data-security practices.

95. Quantum Health continues to possess and control the Private Information of Plaintiff and Class Members, and, upon information and belief, has not remediated the deficiencies that caused the Data Breach. Plaintiff and Class Members therefore remain at a substantial and continuing risk of further unauthorized access to and disclosure of their Private Information.

96. Plaintiff, individually and on behalf of the Class, seeks a declaration that: (a) Quantum Health's existing data-security practices are inadequate and do not comply with applicable legal and industry standards; (b) Quantum Health owes continuing duties to safeguard Plaintiff's and Class Members' Private Information; and (c) Quantum Health must implement and maintain reasonable administrative, physical, and technical safeguards on an ongoing basis.

97. Plaintiff, individually and on behalf of the Class, also seeks injunctive relief requiring Quantum Health to, among other things: implement and maintain reasonable security

measures, including workforce security-awareness training, phishing-resistant multi-factor authentication, least-privilege access controls, network segmentation, encryption, and logging, monitoring, and data-loss-prevention tools; engage independent third-party security auditors to test and audit its systems on a periodic basis; maintain and test an effective incident-response plan; and provide Plaintiff and Class Members with adequate, lifetime credit and identity monitoring and identity-theft insurance sufficient to address the permanent risk created by the Data Breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in their favor and against Quantum Health, and grant the following relief:

(a) Certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as a Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b) Awarding Plaintiff and the Class actual, compensatory, consequential, statutory, and nominal damages in an amount to be determined at trial;

(c) Awarding restitution and disgorgement of all benefits Quantum Health unjustly retained;

(d) Awarding declaratory and injunctive relief as described above, including orders requiring Quantum Health to improve its data-security practices and to provide adequate, long-term credit and identity monitoring and identity-theft insurance;

(e) Awarding pre-judgment and post-judgment interest to the maximum extent allowable;

(f) Awarding Plaintiff and the Class their reasonable attorneys' fees, costs, and expenses as allowable by law; and

(g) Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
*Trial Counsel*
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Marc H. Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
Telephone: (215) 867-2399 Email:
medelson@edelson-law.com

* Motion to appear *pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*